**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 99-2560-CIV-MORENO/DUBE

H. ROBERT HOLMES, AS TRUSTEE FOR )
THE HOLMES FAMILY TRUST, On Behalf )
of Himself and All Others Similarly )
Situated, )
           )
       Plaintiff, )
           )
  vs. )
           )
DALE S. BAKER, GARLAN BRAITHWAITE, )
HAROLD   M.   WOODY,   JOSEPH   E. )
CIVILETTO, AVIATION SALES COMPANY )
and ARTHUR ANDERSEN LLP, )
           )
       Defendants. )
_____ )

**NIGHT BOX
FILED**

SC MAR 1 5 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned counsel, allege upon personal knowledge as to their own acts and upon the investigation conducted by their counsel, which included, among other things, a review of the public announcements made by defendants, Securities and Exchange Commission ("SEC") filings, press releases, media reports and discussions with consultants, and others in the industry regarding Aviation Sales Company ("Aviation Sales" or the "Company") as follows:

### NATURE OF THE ACTION

1.   This is a securities class action brought under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k and 77o, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.

§§78j(b), and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5.

2.   The Section 11 claim is brought on behalf of persons who purchased the stock of defendant Aviation Sales in a secondary offering (for 2 million shares of stock at $36.69 per share), which became effective on June 16, 1999 (the "Offering"). This claim alleges that the Registration Statement and Prospectus ("Prospectus") issued in connection with the Offering misrepresented and omitted material facts in that, *inter alia*, the financial statements incorporated therein, including the financial statements for the periods ended December 31, 1997 and 1998 and for the three month period ended March 31, 1999, were false and misleading, and in violation of Generally Accepted Accounting Principles ("GAAP"). This claim, which is styled Count I in this Amended Complaint, is brought against defendant Aviation Sales, the issuer of that offering, and Aviation Sales' executives who signed the Prospectus in connection with the Offering.[1]   It is also brought against Arthur Andersen LLP ("AA"), Aviation Sales' outside auditor which expertised the annual financial statements incorporated into the Prospectus. This Count alleges only that the Prospectus misrepresented and omitted material facts. There is no allegation with respect to Count I that any of the defendants acted with scienter.

---

[1]   Count I is also brought under Section 15 of the Securities Act against certain of the defendants for control person liability.

3.    The remaining two counts of this Amended Complaint are brought under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of all persons who purchased or otherwise acquired the stock of Aviation Sales during the period March 26, 1998 through and including January 28, 2000 (the "Class Period") to recover damages resulting from a massive accounting fraud perpetrated by defendants during the Class Period.   The defendants are the Company, certain of its top current and former executive officers and AA.

4.    Aviation   Sales   describes   itself   as   the   leading independent provider of fully integrated aviation inventory and maintenance   services,   including   aircraft   heavy   maintenance, component   repair   and   overhaul,   leasing,   the   distribution   of aircraft  spare  parts  and  the  manufacture  of  new  components  for major  commercial  airlines,  original  equipment  manufacturers  and maintenance and repair facilities throughout the world.

5.    During the Class Period, Aviation Sales' stock traded at artificially inflated prices as high as $47-5/16 per share.  After the disclosures on September 18, 1999 and January 28, 2000, the Company's stock dropped to as low as $9-3/4 per share.  The stock currently trades at less than $9.00 per share.

6.    As set forth hereafter, defendants engaged in a massive accounting fraud.  During the Class Period, the financial results announced by the Company were materially false and misleading and in violation of GAAP.  Its financial statements were audited by defendant AA in violation of Generally Accepted Auditing Standards

3

("GAAS"). Among other wrongful practices, defendants improperly recognized material amounts of revenue on fictitious quarter-end deals known within the Company as "bogies." At the end of each quarter there was a frantic scramble to book revenue and a very large percentage of the quarter's revenue was booked at the end of the quarter. The Aviation Sales Defendants (including the Company and defendants Dale S. Baker ("Baker"), Garlan Braithwaite ("Braithwaite"), Harold M. Woody ("Woody") and Joseph E. Civiletto ("Civiletto")) "cooked" Aviation Sales' books in order to report revenues, profits and growth rates, which defendants had led securities analysts to believe would be achieved and to inflate the price of its stock in the Offering and in connection with the acquisition of other companies. The Aviation Sales Defendants accomplished their financial fraud by means of a number of scams, including:

(a) At the end of financial quarters, in order to ostensibly achieve sales, earnings and growth numbers, defendants created bogus sales, which were known within the company as "bogies". These were invented paper transactions. The revenue was booked but product was not shipped. Bogies were done at the end of each quarter, through the second quarter of 1999. In a typical bogie, false invoices for engines or engine parts were generated by defendants at the Company's headquarters in Miami and transmitted by defendants through the Company's computer system to its warehouses where the invoices were printed out. Then, the fraudulent invoices were "picked," or assembled, by employees at

4

the warehouse.  However, warehousing supervisors, at the direction of defendants Baker, Braithwaite, Civiletto, and Woody instructed employees not to ship the phony "bogie" orders.  After the close of the quarter, employees were ordered by their supervisors, again at the direction of these defendants, to manually cancel the bogie orders in the Company's computer system.  In many cases, the bogie orders were not even "picked" because the false invoices contained orders for products which did not exist at the warehouse.

(b)   The Aviation Sales Defendants caused aircraft engines to be shipped to friendly companies and revenue recorded. The friendly companies then broke down the engines into parts and sold the parts back to Aviation Sales, either directly or through another related company, after the end of the quarter in which the engine revenue had been recorded.   The companies with which Aviation Sales did these deals, included among others, Nortech, Chromalloy and Jet International and were for CF6, JT-8, and JT-9 engines.

(c)   The Aviation Sales Defendants caused Aviation Sales to enter into "bill and hold" transactions with customers which also violated GAAP.  In order to inflate revenues at the end of financial reporting quarters, defendants approached customers who wanted parts shipped at some date in the future, and paid these customers so that they would sign a document stating that the customer had received the parts in the current quarter.   The customers did not request the bill and hold transaction.  The bill and hold transactions were done even though the parts had not been

received by the customer and had not been shipped to the customer in the current quarter (when the revenue was booked) and even though in some instances the parts did not yet exist. Where the parts did exist, the goods were not segregated by Aviation Sales for the customer, and the customer did not pay any insurance or warehousing charges to cover the parts on which Aviation Sales had booked revenue and which were still stored at Aviation Sales' facilities;

(d)  The Aviation Sales Defendants caused Aviation Sales to store inventory at certain customers, including but not limited to Lufthansa, British Aerospace and British General Electric. Even though Aviation Sales had booked revenue on certain of this inventory, it also included these parts in Aviation Sales' inventory; and

(e)  The Aviation Sales Defendants caused the Company to violate GAAP by failing to write down material amounts of obsolete and defective inventory during the Class Period, thus materially overstating the Company's net income and earnings per share. Indeed, by the end of the year ended December 31, 1997, at least 30% of the Company's reported inventory was overvalued. Many items were classified on the Company's books as "new" or "overhauled" when they should have been classified as "irreparable" or "unserviceable" and therefore were worthless. Other items were unusable because they did not have proper documentation, without which they could not be sold. To sell an aircraft part, regulatory authorities require that there be documentation which traces the

manufacture and history of the part.  Aviation Sales did not have such documentation for a material amount of inventory and consequently was not able to sell that inventory.  Nonetheless, defendants knowingly recorded on Aviation Sales' books the full value of such inventory even though they knew that it did not have that value.  Other parts were simply so old that there was no longer any market for them.

7.   During the summer of 1999, The B.F. Goodrich Company ("Goodrich") had discussions with Aviation Sales about the acquisition of Aviation Sales by Goodrich.  During the course of those discussions, Goodrich learned about certain of the "bogies" and other improper revenue recognition practices and decided not to acquire Aviation Sales.  As a result of Goodrich's discoveries, defendant Braithwaite, the then Vice President of Finance, became scared.  After the release of Aviation Sales' June 30, 1999 results, Braithwaite transmitted an internal memorandum in which he directed that Aviation Sales would no longer recognize revenue where product had not been shipped.  As a result, Aviation Sales did not engage in these improper revenue recognition practices, during the third quarter of 1999 (ended September 30, 1999). Consequently, on September 18, 1999, the company announced that instead of projected earnings per share of $0.70 for the third quarter, management expected fully diluted earnings per share to be between $0.48 and $0.50.  Following these disclosures the price of Aviation Sales stock declined 36% to $18 11/16.

8.     Defendants Baker and Woody intended to resume these improper revenue recognition practices in the December 1999 quarter.  In order to do this, they caused defendant Braithwaite to be removed from his position as Vice-President of Finance effective on December 2, 1999 and had him replaced by someone whom they thought would not know about or would not stop these fraudulent practices.  However, Aviation Sales' outside auditors, AA became fearful that Aviation Sales' fraudulent accounting would become known and prevented Aviation Sales from engaging in the fraudulent practices in the December 1999 quarter.

9.     Without these fraudulent practices, Aviation Sales could not achieve expected revenue and earnings numbers and on January 28, 2000, the Company issued a press release disclosing that its revenues for the fourth quarter ended December 31, 1999 would be "significantly short" of expectations.  The price of the Company's stock declined another 36% in a single day from $15 5/16 to close on January 28 at 9 3/4.  The price of Aviation Sales stock has not recovered and currently trades for less than $7.00 per share.

10.    As of March 10, 2000, Aviation Sales had not released its final results for the fourth quarter and year ended December 31, 1999.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o,

8

and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5.

12. Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and transactions constituting the violations of law alleged herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in substantial part in this Judicial District. In addition, Aviation Sales maintains its principal executive offices within this Judicial District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## THE PARTIES

14. Lead plaintiffs H. Robert Holmes, as Trustee for the Holmes Family Trust, H. Robert Holmes IRA, H. Robert Holmes, as General Partner of Gilford Partners, Debra Holmes, Debra Holmes as Trustee for Kelly E. Holmes and Debra Holmes, as Trustee for William B. Holmes purchased shares of Aviation Sales during the Class Period and were damaged thereby. Their purchases are set forth in Appendix A attached hereto.

15. As set forth in Appendix B, other plaintiffs also purchased Aviation Sales stock during the Class Period, including

several persons who purchased shares issued under the Prospectus effective June 16, 1999 at the offering price of $36.69 per share, and were damaged thereby.

16.  Defendant Aviation Sales is incorporated in the state of Delaware and maintains its principal place of business in Miami, Florida.  As of August 10, 1999, Aviation Sales had approximately 15 million shares of stock outstanding.  Aviation Sales stock was, during the Class Period, actively traded on the New York Stock Exchange ("NYSE").

17.  Defendant Baker was, at all relevant times, the President and Chief Executive Officer of Aviation Sales and Chairman of Aviation Sales' Board of Directors.  As set forth herein, Baker participated in and orchestrated the accounting fraud, including the phony revenue recognition described herein.  He personally created phony invoices and directed others to do so. Defendant Baker signed Aviation Sales' 1997 Report on Form 10-K dated March 31, 1998, 1998 Report on Form 10-K dated March 31, 1999, Amended 1998 10-K dated April 30, 1999, and the Company's June 10, 1999 Prospectus.  As of June 10, 1999, Baker held approximately 343,250 shares of Aviation Sales stock (including vested options) or 2.7% of the shares outstanding.

18.  Defendant Braithwaite, was Vice President-Finance and Principal Accounting Officer of Aviation Sales from February 1999 until December 2, 1999 when he was demoted.  Braithwaite is liable for his participation in the fraud from February 1999 until he left the Company.  Braithwaite knew that Aviation Sales was improperly

recognizing revenue in violation of GAAP. Nevertheless, he signed Aviation Sales' 1998 Report on Form 10-K, dated March 31, 1999, Amended 1998 10-K dated April 30, 1999, first quarter 1999 Report on Form 10-Q (dated May 14, 1999), second quarter 1999 10-Q (dated August 13, 1999), and the Prospectus. As set forth herein, during the summer of 1999, when Goodrich was considering the acquisition of Aviation Sales, Goodrich discovered some of the improper practices described herein. When Braithwaite learned this he became scared and issued an internal memorandum directing that revenue no longer be recognized when product had not been shipped.

19. Defendant Civiletto was Aviation Sales' Chief Financial Officer from the beginning of the Class Period until February 1999. Civiletto is liable for his participation in the fraud from the beginning of the Class Period until he left the Company in February 1999. As set forth herein, Civiletto had knowledge of and participated with defendants Baker and Woody in the fraudulent accounting practices including the preparation of phony bogie paper transactions, which included false invoices. With knowledge of the fraud, defendant Civiletto signed Aviation Sales' fraudulent 1997 Report on Form 10-K, and the Company's fraudulent Reports on Form 10-Q for the quarters ended March 31, 1998, June 30, 1998, and September 30, 1998.

20. Defendant Woody, was, at all relevant times, Executive Vice President of Sales and Marketing, a director of the Company, and President of Aviation Sales Leasing Company. As set forth herein, Woody knew of and participated in the fraudulent accounting

practices including the preparation of false invoices. With knowledge of the fraud, defendant Woody signed Aviation Sales' fraudulent 1997 Report on Form 10-K dated March 31, 1998, its fraudulent 1998 Report on Form 10-K dated March 31, 1999 and the Company's Prospectus. As of June 10, 1999, Woody held 234,950 shares of Aviation Sales stock (including vested options), or 1.9% of the shares outstanding.

21. The Company and defendants Baker, Braithwaite, Woody and Civiletto are referred to collectively as the "Aviation Sales Defendants", Civiletto for the period until he left the Company February 1999 and Braithwaite from February 1999 when he became Vice-President - Finance.

22. Defendant AA is an accounting firm with more than 382 locations in 81 countries, and maintains its worldwide headquarters at 33 W. Monroe Street, Chicago, Illinois, 60603. As detailed herein, AA continually served as Aviation Sales' auditor since at least December 31, 1996 and issued unqualified opinions included in the Company's Prospectus and in the Reports on Form 10-K for the years ended December 31, 1997 and December 31, 1998, certifying that it had audited the Company's financial statements in accordance with GAAS, and that, in its opinion, the financial statements "present fairly, in all material respects, the financial position of Aviation Sales Company and subsidiaries as of December 31, 1997 and 1998, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1998 in conformity with generally accepted accounting

principles." The financial statements contained in the Prospectus including those for the periods ended December 31, 1997 and 1998 and for the three months ended March 31, 1999, were expertised by AA.

### CONTROLLING PERSONS

23.  Defendants Baker, Braithwaite, Woody and Civiletto were controlling persons of Aviation Sales within the meaning of Section 15 of the Securities Act and 20(a) of the Exchange Act by reason of their respective management positions in Aviation Sales, and/or their membership on Aviation Sales' Board of Directors and/or their stock ownership as well as their participation throughout the Class Period in the day-to-day business affairs of Aviation Sales. Because of their positions in the Company and/or their stock ownership, and/or because of their positions on the Aviation Sales Board of Directors, these defendants had the power and influence to control the Company and caused Aviation Sales to engage in the unlawful acts and conduct alleged herein.

### THE FALSE AND MISLEADING PROSPECTUS

24.  On June 10, 1999, Aviation Sales issued a Prospectus registering 2 million shares of stock to be sold in a secondary offering which became effective on June 16, 1999.  In an effort to lend credibility to the Company's financial statements, the Prospectus stated:

> The following summary historical consolidated
> financial data for the three years ended
> December 31, 1996, 1997 and 1998 has been
> derived from our consolidated financial
> statements, which have been audited by Arthur

13

Andersen LLP, independent certified public accountants, and which are included elsewhere in this prospectus.

25. Under the heading, "Government Regulation and Traceability," the Prospectus also stated:

The inspection, maintenance and repair procedures for the various types of aircraft and aircraft equipment are prescribed by regulatory authorities and can be performed only by certified repair facilities utilizing certified technicians. Certification and conformance is required prior to installation of a part on an aircraft. . . .

An important factor in the aircraft spare parts redistribution market relates to the documentation or traceability that is supplied with an aircraft spare part. We require all of our suppliers to provide adequate documentation as dictated by the appropriate regulatory authority. We utilized electronic data scanning and storage techniques to maintain complete copies of all documentation. Documentation required includes, where applicable:

· a maintenance release from a certified airline or repair facility signed and dated by a licensed airframe and/or power plant mechanic who repaired the aircraft spare part and an inspector certifying that the proper methods, materials and workmanship were used;

· a "teardown" report detailing the discrepancies and corrective actions taken during the last shop repair; and

· an invoice or purchase order from an approved source.

As set forth below, these statements were false and misleading because Aviation Sales did not follow proper traceability practices.

14

26.   The  Prospectus  contained  Aviation  Sales'  financial results for the periods ended December 31, 1997 and 1998 and for the three month period ended March 31, 1999.

27.   The Prospectus also included the report of defendant AA stating that it had audited the Company's financial statements as of December 31, 1997 and 1998 in accordance with GAAS, and that, in its opinion, these financial statements "present fairly, in all material respects, the financial position of Aviation Sales. . . in conformity with [GAAP]."

28.   The Prospectus contained misrepresentations and omissions of material fact because Aviation Sales' financial results for the years ended 1997 and 1998 and the quarter ended March 31, 1999, were materially false and misleading and in violation of GAAP because,  among  other  wrongful  practices,  the  Aviation  Sales Defendants  improperly  recognized  material  amounts  of  revenue  on fictitious quarter-end deals known within the Company as "bogies." The Aviation Sales Defendants "cooked" the Company's books in order to report revenues, profits and growth rates, which defendants had led  securities  analysts  to  believe  would  be  achieved  and  because defendants intended to have a public offering of Aviation Sales stock.   In addition, the Company intended to use its stock to acquire other companies.   The Aviation Sales Defendants "cooked" the Company's books by means of a number of scams as set forth in ¶ 6, supra, and ¶¶ 57 and 71, infra.

15

## COUNT I

**Against All Defendants (Except Civiletto)
Under Section 11 Of The Securities Act And
Against Defendants Baker, Braithwaite and
Woody Under Section 15 of the Securities Act**

29.   This Count is brought on behalf of persons who purchased Aviation Sales stock issued pursuant to the June 16, 1999 Offering.

30.   Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs, as if fully set forth herein. However, with respect to this Count, plaintiffs specifically exclude any allegation of knowledge or scienter, on the part of defendants.

31.   As set forth above, the Prospectus contained misrepresentations of material facts and omitted to state material facts required to be stated in order to make the statements contained therein not misleading.   As such, the defendants are liable to plaintiffs and the class.

32.   Defendants issued, caused to be issued and participated in the issuance of materially false and misleading statements to the investing public that were contained in the Prospectus.   As a direct and proximate result of defendants' wrongful conduct, the market price for Aviation Sales stock sold pursuant to the Prospectus was artificially inflated, and plaintiffs and the class suffered substantial damages in connection with their purchase of Aviation Sales stock in the Offering.

33.   This action was brought within one year after the Aviation Sales stock was sold to the public under the Offering.

34.   Plaintiffs and the other members of the class were damaged by defendants' misconduct and by the material misstatements and omissions of the aforementioned Prospectus.

35.   The defendants utilized national securities exchanges, the mails, telephones and other instruments of interstate commerce in the offering and sale of Aviation Sales stock.

36.   By reason of the foregoing, defendants have violated Section 11 of the Securities Act and defendants Baker, Braithwaite, and Woody have violated Section 15 of the Securities Act.

### COUNT II

**Against All Defendants For Violations
Of Section 10(b) Of
The Exchange Act and Rule 10b-5**

37.   Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs, as if fully set forth herein.

38.   This Count is brought against all the defendants for the allegations set forth above and for the statements set forth hereafter.

39.   Throughout the Class Period, the defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or severely recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiffs and the other members of the class; made various false statements of material facts and omitted to state material facts to make the statements made, in light of the circumstances in which they were made, not misleading; and employed

17

manipulative or deceptive devices and contrivances in connection with the sale of Aviation Sales stock.

40. The purpose and effect of the defendants' plan, scheme and course of conduct was to artificially inflate and maintain the market price of Aviation Sales stock.

41. Defendants Baker, Braithwaite, Woody, and Civiletto as senior officers and/or directors of Aviation Sales, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiffs and the other members of the class, or, in the alternative, acted with severe reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Aviation Sales personnel to the SEC, plaintiffs, and other members of the class.

42. AA's audits of Aviation Sales were conducted in violation of GAAS in that AA false represented that Aviation Sales financial statements for the years ended December 31, 1997 and December 31, 1998 were presented in conformity with GAAP and that they had been audited in accordance with GAAS.

43. As a result of the foregoing, the market price of Aviation Sales stock was artificially inflated during the Class Period. In ignorance of the falsity of the reports and statements, and the deceptive and manipulative devices and contrivances employed by the defendants, plaintiffs and the other members of the class relied, to their damage, on the reports and statements described above and/or the integrity of the market price of

18

Aviation Sales stock during the Class Period in purchasing Aviation Sales stock at prices which were artificially inflated as a result of the defendants' false and misleading statements.

44.   Had plaintiffs and the other members of the class known of the material adverse information which the Aviation Sales Defendants did not disclose, they would not have purchased Aviation Sales stock at the artificially inflated prices that they did.

45.   As a result of the wrongful conduct alleged herein, plaintiffs and other members of the class have suffered damages in an amount to be established at trial.

### SCIENTER

46.   As set forth above, defendants' scienter is alleged only as to defendants' liability under Section 10(b) and 20(a) of the Exchange Act and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5.

47.   Defendants Baker, Braithwaite, Woody, and Civiletto knew of and/or actively participated in the fraud.  They knew that Aviation Sales' financial statements were fraudulent and not consistent with GAAP.  Because of their positions with the Company, they controlled and/or possessed the power and authority to control the contents of the financial statements, press releases and presentations to securities analysts and thereby the investing public.  The Aviation Sales Defendants prepared or were provided with copies of the Company's press releases alleged herein to be misleading prior to or shortly after their issuance and had the

19

ability and opportunity to prevent their issuance or cause them to be corrected.

48.  Defendant AA also knew or severely recklessly disregarded the fraud.  During the course of their work at Aviation Sales, AA became aware of the fact that the Company was inappropriately recognizing revenue in connection with bill and hold transactions and also became aware that the Company's reported inventory balances were materially overstated.  AA nonetheless issued unqualified audit certifications for the Company's 1997 and 1998 financial statements.

49.  Each of the defendants is liable as a primary violator, for making materially false and misleading statements, and for participating in a fraudulent scheme that operated as a fraud or deceit on purchasers of Aviation Sales stock during the Class Period.  The defendants pursued a fraudulent scheme in furtherance of their common goal, i.e., inflating the price of Aviation Sales stock by making materially false and misleading statements and concealing material adverse information.  The fraudulent scheme was designed to and did: (i) deceive the investing public, including plaintiffs and members of the class; (ii) artificially inflate the price of Aviation Sales stock during the Class Period; (iii) allow Aviation Sales to acquire other companies using its artificially inflated stock as currency; (iv) permit the Offering to occur; and (v) cause plaintiffs and members of the class to purchase Aviation Sales stock at inflated prices.

50.   As set forth herein, the Aviation Sales Defendants knew of, and directed the accounting improprieties committed at Aviation Sales.  In further support of the allegations that defendants knew of the alleged fraud, defendants also possessed the motive and opportunity to commit the fraud.

51.   The Aviation Sales Defendants' motive to engage in this conduct included their desire to artificially inflate the price of Aviation Sales' stock and to cover up and conceal Aviation Sales' deteriorating business and prospects in order to accomplish seven mergers and acquisitions between 1997 and 1999 using Aviation Sales' stock as consideration in several of the transactions. Indeed, in the Company's press release of September 18, 1999, defendant Baker admitted that the Company's goal had been to accomplish additional mergers and/or acquisitions using Aviation Sales' stock:

> We have been very active in our review and consideration of merger and acquisition opportunities.  However, while we have explored numerous potential transactions, we have not recently found acquisition targets at prices at which we believed it made sense for our business.  This, in part, has led us to adopt a strategy of build vs. buy to accomplish part of our future growth; hence the development of several of our new facilities. Additionally, we actively negotiated during the third quarter with two large transaction partners.  While these discussions have been positive, we believe that given the recent activity in the market price of our stock, these transactions will probably not be possible at this time.

52.   Also, during 1998, Aviation Sales used approximately $71 million in cash for operations and $114 million in cash for acquisitions and fixed asset purchases.  Aviation Sales had to fund these cash deficits by borrowing $78 million on its revolving loan

21

and obtaining $164 million in senior subordinated notes. Aviation Sales' revolving loan credit facility required the Company to maintain certain financial covenants, including, working capital, fixed charge coverage ratio and tangible net worth. Had defendants revealed the true state of Aviation Sales' financial condition and results of operations, Aviation Sales would have been in default of certain of its financial covenants, and would not have been able to increase its revolving loan credit facility from $200 million at September 1998 to $300 million by May 1999. Without its revolving loan facility, Aviation Sales would have had dire cash flow problems resulting in disastrous business prospects for the Company.

53. As set forth below, each of the positive statements and omissions about Aviation Sales' business during the Class Period was materially false and misleading.

54. By reason of the foregoing, the defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to plaintiffs and the other members of the class for the substantial damages which they suffered in connection with their purchase of Aviation Sales stock during the Class Period.

<u>**ADDITIONAL FALSE AND MISLEADING STATEMENTS**</u>

55. On March 26, 1998, defendants caused Aviation Sales to announce its results for the quarter and year ended December 31, 1997. The Company stated:

Aviation Sales Company (NYSE:AVS) today announced record results for the fourth quarter and year ended December 31, 1997. Fourth quarter operating revenues rose 56.7% to $76.8 million, from $49.0 million for the same period last year. Net income increased 61.3% to $5.0 million, or $0.53 of earnings per diluted share, compared with 1996 fourth quarter net income of $3.1 million, or earnings of $0.33 per diluted share. For the year ended December 31, 1997, operating revenues rose 58.7% to $256.9 million from $161.9 million for the previous year. Net income for 1997 increased to $16.8 million, or $1.77 per diluted share, compared with pro forma earnings of $1.32 per diluted share before extraordinary charges associated with the Company's July 1996 initial public offering. The improved results for both the quarter and year ended December 31, 1997 reflect the contribution from recent acquisitions, internal growth in the company's core business, including strong consignment sales, and continued growth in its inventory management services.

Dale S. Baker, chairman and chief executive officer, commented, "We are on target with our plan for the fourth quarter. In 1997, we continued to improve the revenues from our core operations while diversifying our product and service offerings through the acquisitions of Aerocell, Kratz-Wilde and Apex. We also improved our cash flow and carefully managed our balance sheet. Our recent debt offering of senior subordinated notes raised $165 million at an attractive interest rate and affords us considerable financial flexibility as we continue to grow our company in 1998."

56. These results were repeated in Aviation Sales' 1997 Report on Form 10-K filed with the SEC on or about March 31, 1998 which was signed by defendants Baker, Civiletto and Woody. In the Report on Form 10-K, the Company stated:

REVENUE RECOGNITION -- Sales of aircraft parts are recognized as revenue when the product is shipped and title has passed to the customer. . . .

\*        \*        \*        \*        \*

INVENTORIES

> Inventories, which consist primarily of aviation parts, are stated at the lower of cost or market on primarily a specific identification basis. . . .

57.  Aviation Sales' revenue and inventory for the quarter ended December 31, 1997 were overstated by at least $10,000,000 and the Company's net income was overstated by at least $6,000,000, reducing Aviation Sales' quarterly net income of $4,998,000 <u>to a loss</u> of $1,000,000 and reducing net income for the year from $16.8 million to $11.8 million, or by approximately 30%.    The representations in the 10-K were materially false and misleading because, at the direction of defendants Baker, Civiletto, and Woody, the Company was recording revenue prior to shipment.    In addition, inventories were <u>not</u> being stated at the lower of cost or market.    The financial statements for the year ended 1997 were materially false and misleading and in violation of GAAP because, among other wrongful practices, the Aviation Sales Defendants improperly recognized material amounts of revenue on fictitious quarter-end deals known within the Company as "bogies."    The Aviation Sales Defendants "cooked" the Company's books in order to report revenues, profits and growth rates, which defendants had led securities analysts to believe would be achieved and because defendants intended to have a stock offering and to use the Company's stock to acquire other companies.    The Aviation Sales Defendants "cooked" the Company's books by means of a number of scams:

(a)  At the end of financial quarters, in order to ostensibly achieve numbers, defendants created bogus sales, which

were known within the company as "bogies". These were invented paper transactions. The revenue was booked but product was not shipped. Bogies were done at the end of each quarter, through the second quarter of 1999. In a typical bogie, false invoices for engines or engine parts were generated by the Aviation Sales Defendants at the Company's headquarters in Miami and transmitted by them through the Company's computer system to its warehouses where the invoices were printed out. Then, the fraudulent invoices were "picked," or assembled, by employees at the warehouse. However, warehousing supervisors, at the direction of the defendants Baker, Woody, and Civiletto instructed employees not to ship the phony "bogie" orders. After the close of the quarter, employees were ordered by their supervisors, again at the direction of these defendants, to manually cancel the bogie orders in the Company's computer system. In many cases, the bogie orders were not even "picked" because the invoices contained orders for product which did not exist at the warehouse.

(b)   The Aviation Sales Defendants caused the Company to ship aircraft engines to friendly companies and revenue recorded. The friendly companies then broke down the engines into parts and sold the parts, including the discs, back to Aviation Sales, either directly or through another related company. Aviation Sales did these dales with, among others, Nortech, Chromalloy and Jet International for CF6, JT-8, and JT-9 engines.

(c)   The Aviation Sales Defendants caused the Company to enter into "bill and hold" transactions with customers, which also

25

violated GAAP.   In order to inflate revenues at the end of financial reporting quarters, defendants approached customers who wanted parts shipped at some date in the future, and paid these customers so that they would sign a document stating that the customer had received the parts in the current quarter.  This was done at the request of Aviation Sales and not the customer.  The customers did not request the bill and hold transaction.  Moreover, this was done even though the parts were not shipped to the customer in the current quarter (when the revenue was booked) and even though in some instances the parts did not yet exist.  Where the parts did exist, the goods were not segregated for the customer and the customer did not pay any insurance or warehousing charges to cover the parts on which Aviation Sales had booked revenue and which were still stored at Aviation Sales' facilities;

(d)   The Aviation Sales Defendants caused the Company to store inventory at certain customers, including but not limited to Lufthansa, British Aerospace and British General Electric.  Even though Aviation Sales had booked revenue on certain of this inventory, it also included these parts in Aviation Sales' inventory; and

(e)   At Aviation Sales, at the end of each quarter there was

(f)   In addition, Aviation Sales also violated GAAP by failing to write down material amounts of obsolete and defective inventory during the Class Period, thus materially overstating the Company's net income and earnings per share.  Indeed, by December

26

31, 1997, at least 30% of the Company's reported inventory was overvalued.  Many items were classified on the Company's books as "new" or "overhauled" when they should have been classified as "irreparable" or "unserviceable" and therefore were worthless. Other items were unusable because they did not have proper documentation, without which they could not be sold.  To sell an aircraft part, it is regulatory authorities require that there be documentation which traces the manufacture and history of the part. Aviation Sales did not have such documentation for a material amount of inventory and consequently was not able to sell that inventory.  Nonetheless, defendants knowingly recorded on Aviation Sales' books the full resale value of such inventory even though they knew that it did not have that value.  Other parts were simply so old that there was no longer any market for them.

58.  On March 26, 1998, the Company also announced that it had entered into a definitive merger agreement with Whitehall Corporation ("Whitehall").  Under the terms of the agreement, at the effective date of the merger, the shareholders of Whitehall would receive 0.5143 shares of Aviation Sales stock for each share of Whitehall stock outstanding.  Based on the approximately 5,530,000 Whitehall shares outstanding, Aviation Sales issued 2,844,079 shares of Aviation Sales stock to Whitehall shareholders. The value of the transaction was approximately $121 million, which included the assumption of $9.4 million of Whitehall's outstanding indebtedness.

59.   On April 30, 1998, defendants caused Aviation Sales to announce its results for the first quarter ended March 31, 1998. The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced record results for the first quarter ending March 31, 1998. First quarter operating revenue rose 50.3% to $82.5 million, from $54.9 million for the same period last year.  Income before extraordinary item increased 46.7% to $4.4 million, or $0.45 per diluted share, compared with 1997 first quarter net income of $3.0 million, or $0.32 per diluted share.

> \*     \*     \*     \*     \*

> Dale S. Baker, chairman and chief executive officer, commented, "The first quarter of 1998 represents our seventh consecutive quarter of record revenue and strong earnings performance since completing our initial public offering.  During this quarter we completed several strategic actions including the acquisition of Caribe Aviation, Inc., a provider of component maintenance and repair, and its wholly owned subsidiary Aircraft Interior Design, Inc., which provides manufacturing and repair of aircraft interior components.  A debt offering of senior subordinated notes raised $165 million at an attractive interest rate.  We also announced the proposed merger with Whitehall Corporation, a leader in the maintenance repair and overhaul of aircraft."

60.   These results were repeated in Aviation Sales' Report on Form 10-Q filed with the SEC on or about May 15, 1998 which was signed by defendant Civiletto.

61.   These results were materially false and misleading for the reasons set forth in paragraphs 6 and 57.   The Company's revenue and inventory for the quarter ended March 31, 1998 were overstated by at least $3,000,000 and the Company's net income was overstated by at least $1,750,000, or by at least 66%.

62.   On July 28, 1998, defendants caused Aviation Sales to announce its results for the second quarter ended June 30, 1998. The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced record revenues for the second quarter ending June 30, 1998. Second quarter operating revenues rose 56.8% to $91.1 million, from $58.1 million for the same period last year. Operating income increased 45.9% to $12.4 million, compared with $8.5 million for the same period last year. Net income increased 11.6% to $4.8 million or $0.50 per diluted share, compared with 1997 second quarter net income of $4.3 million, or $0.45 per diluted share.  The 1998 second quarter results were negatively impacted by non-recurring operating expenses of $760,000 or $0.05 per diluted share (after-tax) related to the Company's pending merger transaction with Whitehall Corporation, and were positively impacted by the contribution of recent acquisitions and strong internal growth.

> *    *    *    *    *

> Dale S. Baker, chairman and chief executive officer, commented, "The second quarter of 1998 represents the eighth consecutive quarter of record performance since completing our initial public offering.  In addition to the 30% incremental revenue contributions from our Kratz-Wilde and Caribe Aviation acquisitions for 1998, our results benefitted from strong internal sales growth, which reached 26% for both the second quarter and first half of 1998.  From this solid operating foundation, we look forward to the completion of our merger with Whitehall."

63.   These results were repeated in Aviation Sales' Report on Form 10-Q filed with the SEC on or about July 30, 1998 which was signed by defendant Civiletto.

64.   These results were materially false and misleading for the reasons set forth in paragraphs 6 and 57.   The Company's revenue and inventory for the quarter ended June 30, 1998 were overstated by at least $1,900,000 and the Company's net income was overstated by at least $1,100,000, or by at least 30%.

29

65.  On August 11, 1998, Aviation Sales announced that it had executed a definitive merger agreement with Primark Corp. to acquire Triad International Maintenance Company ("TIMCO").  Under the terms of the acquisition agreement, Aviation Sales would pay $70 million in cash to acquire TIMCO.

66.  On November 10, 1998, defendants caused Aviation Sales to announce its results for the third quarter ended September 30, 1998.  The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced record revenues and net income for the quarter ended September 30, 1998 reflecting strong internal growth and the contribution of acquisitions.  Third quarter operating revenues rose 56.8% to $127.5 million, from $81.3 million for the same period last year.  Operating income increased to $17.7 million, compared with $0.5 million for the same period last year.  Net income increased to $7.9 million or $0.63 per diluted share, compared with the 1997 third quarter loss of $3.7 million, or a loss of $0.30 per diluted share.
>
> *    *    *    *    *
>
> Dale S. Baker, chairman and chief executive officer, commented, "The third quarter of 1998 represents the ninth consecutive quarter of strong growth since we completed our initial public offering.  The 56.8% increase in revenues quarter to quarter is attributable to a 30% growth in our core business complemented by a 27% growth from companies acquired since last year which were not included in our 1997 financial results.  The growth in our operating profitability was driven by the strong turnaround of Whitehall and the continued leveraging of our overhead as a result of the growth in revenue.

67.  These results were repeated in Aviation Sales' Report on Form 10-Q filed with the SEC on or about November 16, 1998 which was signed by defendant Civiletto.

30

68.  These results were materially false and misleading for the reasons set forth in paragraphs 6 and 57.   The Company's revenue and inventory for the quarter ended September 30, 1998 were overstated by at least $2,500,000 and the Company's net income was overstated by at least $1,500,000 or by at least 23%.

69.  On February 10, 1999, defendants caused Aviation Sales to announce its results for the quarter and year ended December 31, 1998.   The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced record revenues and net income for the quarter and year ended December 31, 1998.   Operating revenues rose 55.2% to $500.8 million, from $322.5 million for the year ended December 31, 1997.   Operating revenues for the fourth quarter of 1998 rose 71.2% to $163.8 million, from $95.7 million for the same period in 1997.  Net income for 1998 was $25.5 million ($2.01 per diluted share), compared to $4.8 million ($0.39 per diluted share) for 1997, and net income for the fourth quarter of 1998 was $8.1 million ($0.64 per diluted share), compared to a 1997 fourth quarter loss of $1.2 million (a loss of $0.10 per diluted share).   Increases in operating revenues for both the fourth quarter and year ended December 31, 1998 reflect continued strong internal growth and the contribution of the acquisitions completed by the Company during 1998.
>
> *    *    *
>
> Dale S. Baker, chairman and chief executive officer, commented, "The fourth quarter of 1998 represents the tenth consecutive quarter of strong growth since we completed our initial public offering.  We believe that the growth in our operating profitability is being driven by the strong turnaround in our heavy maintenance operations acquired in connection with our acquisition of Whitehall, by contributions associated with our TIMCO operation since it was acquired, as well as by overall customer acceptance of our Total Inventory Management - TIM and Total Aircraft Maintenance - TAM strategy.

70.  These results were repeated in Aviation Sales' 1998 Report on Form 10-K filed with the SEC on or about March 31, 1999

which was signed by defendants Baker, Woody and Braithwaite.   In the Report on Form 10-K, the Company stated:

> REVENUE RECOGNITION -- Sales of aircraft parts and repairs are recognized as product sales when a unit is shipped and title has passed to the customer or when a repaired unit is returned to the customer. . . .

*       *       *       *       *

> INVENTORIES
>
> Inventories, which consist primarily of aircraft parts, are stated at the lower of cost or market on primarily a specific identification basis. . . .

71.   These results were materially false and misleading for the reasons set forth in paragraphs 6 and 57.   In addition, defendant Braithwaithe knew that Aviation Sales had engaged in bill and hold transactions and that the Company's inventories were overstated by material amounts.   The Company's revenue and inventory for the quarter ended December 31, 1998 were overstated by at least $7,300,000 and the Company's net income was overstated by at least $4,300,000 or by at least 113%.   The representations in the 10-K were materially false and misleading because, as set forth in ¶¶ 6 and 57, at the direction of defendants Baker, Braithwaite, Civiletto, and Woody, the Company was recording revenue prior to shipment.   In addition, inventories were not being stated at the lower of cost or market.   Furthermore, the representations made in the Report on Form 10-K were false and misleading because the Aviation Sales Defendants knew, but failed to disclose, that during the final days of December 1998, bogies were created for the phony sale of: (i) a CF6 jet engine for approximately $1.5 million; (ii)

32

a CFM-56 wide-body engine for between $2-$3 million; and (iii) a JT-8 Pratt and Whitney engine. Also, at the end of the December 1998 quarter, Aviation Sales booked revenue from an ostensible "sale" of an engine to Nortech. Nortech held this engine until after the end of the following quarter and then returned it to Aviation Sales. Moreover, at the end of December, 1998, Aviation Sales entered into a phony bill and hold "sale" with South African Airlines for a JT8 engine for an Airbus 300. Aviation Sales recognized the revenue on this "sale" even though the engine was still being repaired by Cefco and had not been shipped to South African Airlines.

72. On May 5, 1999, defendants caused Aviation Sales to announce its results for the first quarter ended March 31, 1999. The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced revenues and net income for the quarter ended March 31, 1999.
>
> Operating revenues for the first quarter of 1999 rose 74.2% to a record $178.0 million, from $102.2 million for the same period in 1998. Net income for the first quarter of 1999 rose 113.5% to $7.9 million ($0.61 per diluted share), compared to 1998 first quarter net income of $3.7 million ($0.30 per diluted share). Increases in operating revenues for the first quarter of 1999 reflect continued strong internal growth and the contribution of the acquisitions completed by the Company during 1998.
>
> *   *   *
>
> Dale S. Baker, Chairman and Chief Executive Officer, commented, "We are very pleased with our first quarter financial results which reflect both the turnaround and successful integration of our heavy aircraft maintenance operations and overall growing market interest in our Total Inventory Management ("TIM") and Total Aircraft Maintenance ("TAM") strategy.

73.  The Company's first quarter financial results were repeated in its first quarter 1999 Report on Form 10-Q, filed with the SEC on or about May 14, 1999, which was signed by defendant Braithwaite.

74.  These results were materially false and misleading for the reasons set forth in paragraphs 6, 57 and 71.  The Company's revenue and inventory for the quarter ended March 31, 1999 were overstated by at least $1,500,000 and the Company's net income was overstated by at least $900,000, or by at least 13%.

75.  On August 2, 1999, the defendants caused Aviation Sales to announce its results for the second quarter ended June 30, 1999. The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced record revenues and net income for the quarter ended June 30, 1999.  Operating revenues for the second quarter of 1999 rose 64.3% to $179.2 million, from $109.1 million for the same period in 1998.  Net income for the second quarter of 1999 rose 69.6% to $9.5 million ($0.71 per diluted share), compared to 1998 second quarter net income of $5.6 million ($0.44 per diluted share).  Increases in operating revenues for the second quarter of 1999 reflect continued strong internal growth and the contribution of the acquisitions completed by the Company during 1998.
>
> Gross profit increased 52.4% to $44.2 million for the second quarter of 1999, compared with $29.0 million for the same period last year.  Increases in gross profit in the second quarter of 1999 reflect the turnaround in the heavy airframe maintenance operations acquired by the Company in July 1998 through the acquisition of Whitehall, a transaction accounted for as a pooling of interest.  Additionally, gross profit was favorably impacted by the inclusion of Triad International Maintenance Corporation's ("TIMCO") operations which were acquired in a transaction accounted for as a purchase in 1998.

76.   These results were materially false and misleading for the reasons set forth in paragraphs 6, 57 and 71.   The Company's revenue and inventory for the quarter ended June 30, 1999 were overstated by at least $2,400,000 and the Company's net income was overstated by at least $1,400,000, or by at least 17%.   Among other things, at the end of June 1999, Aviation Sales booked revenue in the amount of $300,000 for the "sale" of an Auxiliary Power Unit even though the unit had not been shipped and was still being serviced by Aviation Sales.

77.   The Company's second quarter financial results were repeated in its 10-Q, filed with the SEC on or about August 13, 1999, which was signed by defendant Braithwaite.

78.   On August 16, 1999, Aviation Sales announced that it had closed on the previously announced agreement with Kitty Hawk, Inc. ("Kitty Hawk") to acquire the assets of Kitty Hawk's airframe and JT8D engine maintenance operations.   Under the terms of the acquisition agreement, Aviation Sales paid $18.0 million in cash and was to issue $3.5 million in future purchase credits to Kitty Hawk.

79.   On August 20, 1999, before the opening of the market, defendants caused Aviation Sales to issue the following clarification of disclosures in its Report on Form 10-Q for the quarter ended June 30, 1999, which was originally filed with the SEC on August 13, 1999:

> The Company also commented today, in response to questions which have been raised by the investment

community, regarding its June 30, 1999 financial statements:

> <u>Increase in Inventory</u>:  In response to questions regarding the $77.6 million growth of its inventory between December 31, 1998 and June 30, 1999, the Company commented that approximately $15.0 million of that growth related to the Company's continuing investment during the period in five Airbus a-300B4 aircraft, increasing the Company's investment in those airplanes to $45.9 million. . . . . The Company stated that the increase in the inventory levels in its distribution operations during the first half of 1999 was consistent with its objective of maintaining its world leadership position in the redistribution of airframe parts and with its intended goal of becoming a world leader in the redistribution of engine parts.

80.  Defendants' representations regarding inventory were false and misleading, and omitted material information regarding the Company's business, because as set forth in ¶¶6, 57 and 71, defendants Baker, Braithwaite and Woody knew, but failed to disclose, that the Company's inventory was materially overstated for the quarter and year ended December 31, 1998.

81.  On August 20, 1999, the price of Aviation Sales' stock closed at $37 1/4.  By August 26, 1999, the price had declined to $31 9/16, a decline of more than 15% in less than a week.

82.  In order to arrest the rapid decline of its stock price, on August 26, 1999, defendants Baker, Braithwaithe and Woody caused Aviation Sales to issue a press release headlined "Aviation Sales Says It's Unaware of Reason for Stock Drop."  The release stated:

> Aviation Sales Company (NYSE:AVS) today announced it is unaware of any undisclosed corporate activities or developments that would have caused the recent unusual market activity in the Company's stock.

36

Defendants Baker, Braithwaite, and Woody hosted a conference call with institutional investors, money and portfolio managers, large shareholders, and securities analysts immediately following the issuance of this press release to assure the financial community that it knew of no reason for the recent decrease in the price of its stock.

83.   These representations were directly disseminated to the market and became part of the total mix of information affecting Aviation Sales' shares.   Based upon these representations, on August 27, 1999, the Company's stock price rebounded to $33 1/8 per share.

84.   However, defendants' representations that they were unaware of any undisclosed conditions that would have caused the Company's stock price to decline were false and misleading for the reasons set forth in ¶¶ 6, 57 and 71.

### AVIATION SALES' FIRST EARNINGS SHORTFALL IS DISCLOSED

85.   On September 17, 1999, before the market opened, L. Keith Mullins of Salomon Smith Barney ("SSB") issued a research report on Aviation Sales which stated that after discussions with the Company's management, SSB believed that the Company would not meet its earnings estimates for the third quarter of 1999.

86.   The SSB report, revealing previously undisclosed material information about Aviation Sales' business, caused the price of Aviation Sales' stock to decline almost 30% in a single day from $29 3/8 to $21 on trading of 2.85 million shares, or more than 13 times the three month daily average.

87.   The next day, Saturday, September 18, 1999, the Aviation Sales Defendants caused the Company to issue a press release disclosing that its revenues for the quarter ended September 30, 1999 would be drastically below expectations.   The Company announced, <u>inter alia</u>:

> Aviation Sales Company (NYSE: AVS) today commented on its expected third quarter and 1999 results of operations. The Company stated that it anticipates 1999 per share earnings growth to be in a range of 15% to 17% compared to 1998 earnings per share, and that based upon this level of growth, the Company expects fully diluted earnings per share to be between $.48 and $.50 on revenues of approximately $170 million for the third quarter of 1999 and $2.30 and $2.35 on revenues of approximately $718 million for the 1999 fiscal year.

In addition, the release stated that Company had been actively considering merger and acquisition transactions, but that the recent decline in the market price of the Company's stock now made such transactions improbable.

88.   On September 20, 1999, the first trading day after defendants' press release, the price of the Company's stock fell an additional 11% from 21 to 18 11/16 on trading of approximately 2 million shares, or 10 times the three month daily average. However, as set forth below, the September 18, 1999 press release did not disclose the full extent of the Company's financial troubles.

89.   On November 12, 1999, defendants caused Aviation Sales to announce its actual results for the third quarter ended September 30, 1999.  The Company stated:

> Aviation Sales Company (NYSE:AVS) today announced results for the quarter ended September 30, 1999.

38

In line with earlier indications, operating revenues for the 1999 third quarter were $169.2 million, compared to $127.5 million for the same period last year. Net income for the third quarter of 1999 was $7.3 million, or $0.48 per diluted share, compared to 1998 third quarter net income of $7.9 million, or $0.63 per diluted share.

As previously announced, operating performance in the third quarter was affected by a number of factors. The major factor which affected third quarter results was lower than expected volumes at the Company's manufacturing and flight surfaces repair and overhaul operations. . . .

\*   \*   \*

Dale S. Baker, Chairman and Chief Executive Officer, commented, "The final results of the third quarter were consistent with what we anticipated when we announced our expected results in mid-September. While we are clearly disappointed with our performance for the quarter, we have taken aggressive steps to address the issues which have slowed the growth of our business from what we had originally anticipated. Recently, we strengthened the management teams at our manufacturing and flight services operations, and implemented substantial cost savings at each of these businesses by bringing their staffing into line with the current level of demand. We also succeeded in acquiring several new customers for the new maintenance facilities which we opened during the third quarter."

90. On November 12, 1999, after the release of Aviation Sales' third quarter results, defendants Baker, Braithwaite, and Woody, held a conference call with securities analysts and the financial community. During that conference call, defendant Baker represented the following, inter alia:

-"The distribution company had a very good month of October. So it appears to be tracking towards the plan nicely. Our maintenance airframe, maintenance repair and overhaul facilities at this point are sold out at capacity for the fourth quarter."

-"Demand for our services is strong. Unfortunately, we actually had to turn away some customers in the fourth quarter of this year, simply because we are out of

39

capacity. Again, we are very pleased with the performance we have been able demonstrate in that business..."

-"As you see during our third quarter we were able to successfully reduce down our inventories in our business, particularly redistribution business.... We have had great success in transitioning the business associated with the distribution company, from tactical to strategic."

-"Taking a look at the guidance that we gave for the fourth quarter of this year, <u>we think we are still comfortable with that at this point. We expect we will finish this year with revenues somewhere between $750 to $720 million. Earnings estimate on the street is somewhere in the $2.30 to $2.35 per share range, we're still comfortable with where we sit today</u>. Again, when the dust clears and settles at the end of this year, we believe the top line will have grown approximately 42% to 43%.... <u>We think the results for the year ultimately when it's done and said, will not be disappointing</u>."

-"Business continues to be vibrant, again, at the end of the day, top line growth in excess of 40% for the year."

91. The representations in the press release and conference call were false and misleading because defendants knew, but failed to disclose, that without the help of fictitious "bogies" and other fraudulent accounting practices the Company would fall far short of the market's expectation for its revenue and earnings for the fourth quarter of 1999.

92. As set forth above, defendants Baker, Woody and Braithwaite knew that Aviation Sales would make the earnings estimate which they represented on November 12, 1999 only by engaging again in bogies and other fraudulent accounting transactions at the end of the fourth quarter of 1999. However, as set forth above, defendant Braithwaite had become scared and had prevented the recognition of revenue on bogies and other fraudulent

accounting transactions during the third quarter of 1999. Indeed, Braithwaite had disseminated an internal memorandum stating that revenue would no longer be recognized where parts and engines had not been shipped. Concerned that Braithwaite would attempt to stop the fraudulent accounting practices during the fourth quarter of 1999, in December 1999, Baker and Woody had Braithwaite removed as Vice President - Finance, effective December 2, 1999. He was replaced by a person, whom Baker and Woody thought they could control and/or hide from him the bogies and other fraudulent transactions that they knew they would have to engage in during the fourth quarter in order to meet the represented numbers. However, by this time, AA had also become scared. AA prevented defendants Woody and Baker from engaging in fraudulent bogies and other transactions during the fourth quarter of 1999. As a result, defendants could not achieve the fourth quarter numbers which they had represented to the investment public.

### AVIATION SALES' SECOND EARNINGS SHORTFALL IS DISCLOSED

93. On January 28, 2000, defendants caused the Company to issue a press release disclosing that its revenues for the fourth quarter ended December 31, 1999 would be "significantly short" of expectations. The Company announced:

> Aviation Sales Company (NYSE: <u>AVS</u> - <u>news</u>) today announced that it expects fourth quarter earnings to be significantly short of consensus earnings expectations. The Company stated that the preliminary estimate of fourth quarter 1999 earnings is between $.05 - $.15 per share.

*   *   *

Dale S. Baker, the Company's Chairman, stated, "While we
are disappointed with our fourth quarter results, which
were impacted by several significant one time charges, we
continue to be pleased with the performance of our core
operations, which continue to grow and be profitable. .
. . The Company stated that it expects to release its
final 1999 results on or about February 18, 2000, and
that it will comment further at that time.

94.   This news shocked the market, in light of defendants'
representations on November 12, 1999.   The market reaction was
swift and severe.   The price of the Company's stock fell from $ 15
5/16 to $9 3/4, a 36% decline in a single day.   The stock currently
trades for less than $9.00 per share.

95.   As of March 10, 2000, Aviation Sales had not released its
final results for the fourth quarter and year ended December 31,
1999.

## AVIATION SALES' FALSE FINANCIAL STATEMENTS

96.   Aviation Sales' financial statements for the years ended
December 31, 1997 and 1998 and for the quarters ended March 31,
June 30, and September 30, 1998, March 31, 1999 and June 30, 1999,
as reported in the Company's Form 10-K and 10-Qs for these periods,
and the Prospectus (which included the Company's financials for the
years ended December 31, 1997 and 1998 and the quarter ended March
31, 1999) were fraudulent and violated GAAP.   The Report on Form
10-K for the year ended December 31, 1997 was signed by defendants
Baker, Woody and Civiletto.   The Report on Form 10-K for the year
ended December 31, 1998 was signed by defendants Baker, Braithwaite
and Woody.   The reports on Form 10-Q for the quarters ended March
31, June 30, and September 30, 1998 were signed by defendant

42

Civiletto and for the quarters ended March 31 and June 30, 1999 were signed by defendant Braithwaite. Defendants Baker, Woody and Braithwaite signed the Prospectus. Regulation S-X (17 CFR 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP <u>are presumed to be misleading and inaccurate, despite footnote or other disclosure</u>. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at the particular time. Each of those Reports on Form 10-K and 10-Q also falsely represented, for the subject year and quarter, that Aviation Sales' financial statements, included all adjustments necessary "to present fairly" Aviation Sales' financial condition and results of operations for those respective periods.

97. These representations were false as the Aviation Sales Defendants had falsified Aviation Sales' financial statements during the Class Period by improperly recognizing material amounts of revenue on phony sales and overstating the value of the Company's inventory as detailed herein. The Company's financial statements violated GAAP for these reasons.

98. As a result of defendants' actions described herein, Aviation Sales issued materially false and misleading financial statements during the Class Period, violating GAAP and SEC Rules and Regulations. Aviation Sales' financial statements for the quarters and years ended as follows, were materially overstated from defendants' improper recognition of revenue and failure to

43

value inventory at the lower of cost or market, by at least the following amounts:

**(000's)**

| | REVENUE & INVENTORY OVERSTATEMENTS (AT LEAST) | NET INCOME OVERSTATEMENT (AT LEAST) | % OVER-STATEMENT OF NET INCOME (AT LEAST) |
|---|---|---|---|
| QUARTER ENDED DECEMBER 31, 1997 | $10,000 | $6,000 | N/A[2] |
| YEAR ENDED DECEMBER 31, 1997 | 10,000 | 6,000 | 56% |
| QUARTER ENDED MARCH 31, 1998 | 3,000 | 1,750 | 66% |
| QUARTER ENDED JUNE 30, 1998 | 1,900 | 1,100 | 30% |
| QUARTER ENDED SEPTEMBER 30, 1998 | 2,500 | 1,500 | 23% |
| QUARTER ENDED DECEMBER 31, 1998 | 7,300 | 4,300 | 113% |
| YEAR ENDED DECEMBER 31, 1998 | 8,700 | 5,200 | 52% |
| QUARTER ENDED MARCH 31, 1999 | 1,500 | 900 | 13% |
| QUARTER ENDED JUNE 30, 1999 | 2,400 | 1,400 | 17% |

## IMPROPER RECOGNITION OF REVENUE

99.   Aviation Sales' net income, earnings per share and income from operations were materially overstated during the Class Period due to defendants' practice of recording revenue on fictitious

---

[2]    Not applicable, since the overstatement reduces Aviation Sales' reported quarterly net income of $4,998,000 to a loss of $1,000,000.

sales and on transactions prior to the earnings process being complete. GAAP, as set forth in Statement of Financial Accounting Standards ("SFAS") No. 48, paragraph 6, requires that,

> If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if *all* of the following conditions are met:
>
> a.   The seller's price to the buyer is substantially fixed or determinable at the date of sale.
>
> b.   The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.
>
> c.   The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
>
> d.   The buyer acquiring the product for resale has economic substance apart from that provided by the seller.
>
> e.   The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.
>
> f.   The amount of future returns can be reasonably estimated.

100. The Aviation Sales Defendants' practice of recording bogus sales was an egregious violation of GAAP and SEC Rules and Regulations. Furthermore, Aviation Sales recognized service revenues prior to services being performed, including overstating the amount of revenue earned on contracts in process, as well as entering into improper bill and hold transactions. As a result,

Aviation Sales overstated its accounts receivable, revenue, income from operations and earnings per share during the Class Period.

## IMPROPER REVENUE RECOGNITION ON "BILL AND HOLD" TRANSACTIONS

101. During the Class Period, the Aviation Sales Defendants engaged in the practice of invoicing customers prior to delivering the product to the customer under a bill and hold program designed to recognize revenue in violation of GAAP and Aviation Sales' represented revenue recognition policy.  The SEC has established strict criteria the must be met in order to recognize revenue when delivery to the customer has not occurred as follows:

1.  The risks of ownership must have passed to buyer;

2.  The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

3.  The buyer, not the seller, must request that the transaction be on a bill and hold basis.  The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

4.  There must be a fixed schedule for delivery of the goods.  The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);

5.  The seller must not have retained any specific performance obligations such that the earning process is not complete;

6.  The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

7.  The product must be complete and ready for shipment.

102. Furthermore, the following factors must be considered when a bill and hold transaction occurs:

1.   The date by which the seller expects payment, and whether the seller has modified its normal billing and credit terms for this buyer;

2.   The seller's past experiences with and pattern of bill and hold transactions;

3.   Whether the buyer has the expected risk of loss in the event of a decline in the market value of goods;

4.   Whether the seller's custodial risks are insurable and insured;

5.   Whether extended procedures are necessary in order to assure that there are no exceptions to the buyer's commitment to accept and pay for the goods sold (i.e., that the business reasons for the bill and hold have not introduced a contingency to the buyer's commitment).

103. The SEC is clear that delivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. If the customer specifies an intermediate site but a substantial portion of the sales price is not payable until delivery is made to a final site, then revenue should not be recognized until final delivery has occurred. After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.

104. Aviation Sales entered into these bill and hold transactions not at the customer's request, but solely at Aviation Sales' request in order to accelerate revenue on transactions to meet earnings estimates during the Class Period.

105. Aviation Sales' days sales outstanding ("DSO") in accounts receivable grew to 93 days at September 1999 because of defendants' practice of recording fictitious sales and revenue on transactions prior to the earnings process being complete as noted above. As a result of Aviation Sales failing to comply with GAAP for revenue recognition, its financial statements were materially misstated during the Class Period. Furthermore, Aviation Sales could not collect the fictitious receivables generated as a result of its phony revenue transactions.

### INVENTORY OVERSTATEMENT

106. Aviation Sales' net income and earnings per share were materially overstated during the Class Period due to the Company's failure to write down material amounts of obsolete and defective inventory, which write-downs were required by GAAP and for a fair presentation of Aviation Sales' financial results.

107. Aviation Sales' inventory values and earnings were materially inflated as defendants, in violation of GAAP and Accounting Research Bulletin No. 43 ("ARB 43"), failed to reduce the Company's inventory to the lower of cost or market value. ARB 43, Chapter 4, Paragraph 8 states in relevant part:

> In accounting for inventories, a loss should be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, changes in price levels or other causes. The measure of such losses is accomplished by the rule of pricing inventories at cost or market, whichever is lower.

108. For the year ended December 31, 1997, at least 30% of the Company's reported inventory was overvalued. Many items were

classified on the Company's books as "new" or "overhauled" when they should have been classified as "irreparable" or "unserviceable" and therefore worth much less. Other items were unusable because they did not have proper documentation, without which they could not be sold. These items were on the Company's books as if they were new and had full documentation or "birth papers", which would have made them far more valuable. Other parts were simply so old that there was no longer any market for them.

109. One example of a type of part that was significantly overvalued on the Company's books was data plates. Data plates are metal plates which are inscribed with part and serial numbers and then attached as labels to other parts, including engines. Data plates are parts themselves, and normally should be valued on the Company's books as being worth about $2. However, at least a thousand data plates had been entered into the Company's computer system during the Class Period using the part or engine serial numbers that had been inscribed on them. As a result, data plates that were meant to label engines or engine parts were valued on the Company's books as if they were actually engines or engine parts. As set forth in ¶71, most engines were valued in the millions of dollars. This circumstance alone caused the Company's financial statements to be materially misleading.

110. Another example of a type of part that was significantly overvalued on the Company's books was nose cones or "nacelles." During the Class Period, Aviation Sales had nacelles that were carried on its books as having a value of between $250,000 to

$300,000 each. However, they were so beat up that they should have been classified on the Company's books as Beyond Economical Repair ("BER") or worthless, except for scrap. A number of potential customers examined these nacelles during the Class Period and declined to purchase them because of their poor condition. As such, the Company was well aware that these nacelles were overvalued on the Company's books. Accordingly, Aviation Sales' inventory reported in the financial statements was materially overstated, thus overstating Aviation Sales' gross profit, income from operations, net income, and earnings per share.

## AA'S PARTICIPATION IN THE FRAUDULENT SCHEME

111. As detailed in paragraph 22 above, AA continuously served as Aviation Sales' auditor since at least December 31, 1996, and throughout the Class Period. The 1997 Report on Form 10-K contained a report signed by AA, dated March 2, 1998, stating that:

> We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Aviation Sales Company and subsidiaries as of December 31, 1997 and 1996, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1997 in conformity with generally accepted accounting principles.

112. AA included a virtually identical representation, dated February 9, 1999, in the Company's Report on Form 10-K for the year ended December 31, 1998.

113. AA consented to the use of the reports dated March 2, 1998 and February 9, 1999 which were included in the Company's 1998 and 1999 Form 10-Ks and in Aviation Sales' Prospectus.

114. At the time AA issued its opinions in the Prospectus and the Reports on Form 10-K for fiscal 1997 and 1998, it either knew or, but for its severe reckless disregard of the truth, should have known that the Company's financial results had not been presented in accordance with GAAP, nor had AA conducted its audit in accordance with GAAS.

115. During its yearly audits of Aviation Sales' financial statements, members of the AA engagement team had virtually limitless access to information concerning Aviation Sales' true financial condition:

- AA was present at the Company's headquarters and worldwide subsidiary offices frequently throughout each year.

- AA's foreign offices regularly communicated findings to Miami via interoffice communications.

- AA had unfettered access to documents and employees at all Aviation Sales' offices.

- AA had frequent conversations with the Company's management and employees about the Company's sales, revenue and inventory.

- AA attended Audit Committee meetings and answered the Committee's questions about the Company's financial statements and internal controls.

116. In separate reports, AA opined: (1) that Aviation Sales' 1997 and 1998 financial statements, respectively, were presented in accordance with GAAP; and (2) that AA conducted its audits of those financial statements in accordance with GAAS. These "clean" audit opinions were false and misleading when issued. AA knew or acted with severe reckless disregard for the true facts which indicated that the Company's 1997 and 1998 financial statements were not presented in conformity with GAAP, and its revenues and net income as presented in those financial statements were materially overstated. AA failed to comply with GAAS in performing its audit work and in certifying those financial statements. AA persistently refused to see the obvious, to investigate the doubtful, and its accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts. This was not a mere misapplication of accounting principles. AA's work on the 1997 and 1998 financial statements was so deficient that the audits amounted to no audit at all.

117. AA enjoyed a lucrative, long-standing business relationship with Aviation Sales which generated significant fees for the firm each year. The AA partners responsible for the Aviation Sales engagement were particularly motivated to appease the client because their remuneration was directly tied to the fees generated from Aviation Sales. Maintaining the client relationship was highly dependent on bending to the wishes of the client and AA compromised its independence to do so.

118. AA was well aware of the accounting improprieties set forth herein. With respect to the Company's recognition of revenue in connection with bill and hold transactions, AA compared the terms of these transactions with the requirements of GAAP and knew that the requirements of GAAP had not been met. Nonetheless, AA allowed Aviation Sales to improperly record revenue in connection with these transactions. With respect to the bogus engine "sales" which Aviation Sales was engaging in, AA knew that (1) material amounts of revenue on engine sales were later reversed and (2) Aviation Sales was purchasing parts, including discs, from companies to which Aviation Sales was selling engines. The fact that these engines were immediately returned to the Company either within days or weeks of the end of the quarter was a "red flag" that these were not real "sales". However, AA did nothing to stop these fraudulent "sales" and the resultant recording of fraudulent revenue in 1997 and 1998. Also, AA knew that a large percentage of the Company's quarterly revenue was booked at the end of the quarter, that there was a frantic scramble at the end of quarters to book revenue, and that the percentage of a quarter's revenue which was booked at the end of the quarter was increasing. With respect to the Company's overvaluation of inventory, AA conducted an extensive analysis of this valuation and knew that the inventory was overvalued by material amounts. Indeed, during the summer of 1999, Braithwaite told Baker that AA knew that Aviation Sales' inventory was overstated by material amounts.

119. AA failed to comply with the basic generally accepted auditing standard that, "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AA knew that management of Aviation Sales had an excessive interest in maintaining or increasing its stock price and earnings trend through the use of unusually aggressive accounting practices, such as bill and hold transactions. AA was aware of the wide array of risk factors relating to the management, operating characteristics, industry conditions, and financial stability of Aviation Sales, including but not limited to, inability to generate cash flows from operations while reporting earnings and earnings growth, high dependance on debt, declining margins, aggressive financial forecasts, timing of revenue recognition, and domination of management by a small group.

120. AA's risk assessment should have required AA to exercise professional skepticism, greater care in the assignment of personnel, greater concern about whether the accounting policies adopted by Aviation Sales, especially revenue recognition and inventory valuation, and question the adequacy of Aviation Sales internal controls. Instead of modifying its audit approach due to the significant risk factors of the Aviation Sales audit, as required by GAAS, AA failed to investigate unusual transactions, failed to contact major customers, failed to use the services of a specialist for the valuation of inventory, failed to conduct

interviews of personnel in sales and operations, and failed to identify related party transactions.

121. GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), defines the conduct of auditors in performing and reporting on audit engagements. Statements on Auditing Standards ("SAS") are recognized by the AICPA as the authoritative interpretation of GAAS.

122. AA's failure to qualify, modify or abstain from issuing its audit opinions on Aviation Sales 1997 and 1998 financial statements when it knew or deliberately turned a blind eye to the numerous adverse facts and "red flags" set forth herein caused AA to violate at least the following provisions of GAAS:

(a) AA violated GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP. AA's opinion falsely represented that Aviation Sales' 1997 and 1998 financial statements were presented in accordance with GAAP when they were not for the reasons stated herein.

(b) AA violated Standard of Reporting No. 4, which requires that, when an opinion on the financial statements taken as a whole cannot be expressed, the reasons therefore must be stated. AA should have stated that no opinion could be issued by it on Aviation Sales' 1997 and 1998 financial statements or issued an adverse opinion stating that those financial statements were not fairly presented. AA has also failed to require Aviation Sales to timely restate its previously issued materially false and

55

misleading class period financial statements and allowed Aviation Sales to make material misrepresentations regarding the Company to its shareholders and the investing public during the Class Period. The failure to make such qualification, correction, modification and/or withdrawal was a violation of GAAS, including the Standards of Reporting No. 4.

(c)  AA violated GAAS General Standard No. 2, which requires an auditor to maintain an independent mental attitude in all matters related to the assignment.  As described above, the fees associated with the Aviation Sales engagement were material to AA's Miami office, which made Aviation Sales an extremely important client and caused AA's independence to be compromised.

(d)  AA violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan and supervise the work of its staff and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial information statements.

(e)  AA violated GAAS General Standard No. 3, which requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the report.

(f)  AA violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the

auditing procedures to be applied. In the course of auditing Aviation Sales' financial statements, AA either knew or recklessly disregarded facts which evidenced that it failed to sufficiently understand Aviation Sales' internal control structure and/or it disregarded weaknesses and deficiencies in Aviation Sales' internal control structure, and failed to adequately plan its audit or expand its auditing procedures.

(g) AA violated Standard of Field Work No. 3, which requires sufficient competent evidential matter to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

123. As a result of AA's actions, it knew or severely recklessly disregarded that Aviation Sales financial statements issued during the Class Period were materially false and misleading for the reasons set forth above. Furthermore, it knew or severely recklessly disregarded that its reports on the financial statements of Aviation Sales for the years ended December 31, 1998 and 1997 were false and misleading due to AA's failure to perform its audits in accordance with GAAS and its failure to report that the financial statements associated with those reports were not in compliance with GAAP and were materially false and misleading.

### COUNT III

**Violation Of Section 20(a)
Of The Securities Exchange Act Against
Defendants Baker, Braithwaite, Woody, and Civiletto**

124. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

125. Defendants Baker, Braithwaite, Woody and Civiletto, by virtue of their positions as officers and/or directors of Aviation Sales and their specific acts, were controlling persons of Aviation Sales within the meaning of Section 20(a) of the Exchange Act.

126. Each of the Aviation Sales Defendants' positions made them privy to, and provided them with actual knowledge of, the material facts which Aviation Sales concealed from plaintiffs and the other members of the class during the Class Period.

127. The Aviation Sales Defendants had the power, authority and influence, and exercised the same, to cause Aviation Sales to engage in the unlawful conduct and practices complained of herein by causing Aviation Sales to disseminate the false and misleading information referred to above.

128. By virtue of the foregoing, defendants Baker, Braithwaite, Woody and Civiletto have violated Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their purchase of Aviation Sales stock during the Class Period.

## CLASS ACTION ALLEGATIONS

129. Plaintiffs bring this class action on behalf of (1) with respect to the Securities Act claims, all persons who purchased the stock of defendant Aviation Sales in a secondary offering, which became effective on June 16, 1999; and (2) with respect to the

Exchange Act claims, all persons who purchased or otherwise acquired Aviation Sales stock during the period from March 26, 1998 through and including January 28, 2000 (collectively, the "Class"). Excluded from the Class are the defendants, members of the immediate families of the defendants, and any entities in which any of the defendants have a controlling interest.

130. The members of the Class for whose benefit this action is brought are dispersed throughout the United States, and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can only be determined through appropriate discovery, plaintiffs believe that there are thousands of Class members. During the Class Period, approximately 15 million shares of Aviation Sales stock were outstanding and were actively traded on an impersonal and efficient trading exchange during the Class Period.

131. Plaintiffs' claims are typical of the claims of the other members of the Class, and plaintiffs and all members of the Class sustained damages as a result of the defendants' wrongful conduct complained of herein.

132. Plaintiffs are representative parties who will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class action securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

133. A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein.

Furthermore, because the damages suffered by the individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to individually seek redress for the wrongful conduct alleged herein, and the likelihood of individual class members prosecuting separate claims is remote.

134. This action will allow for the orderly and expeditious administration of the class claims, produce economies of time, effort and expense, and ensure uniformity of decisions. Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

135. There are questions of law and fact common to all class members which predominate over any questions affecting any individual members of the Class. Among the questions of law and fact which are common to the Class are:

a. Whether the federal securities laws were violated by the defendants' acts as alleged herein;

b. Whether the documents, releases, reports and/or statements disseminated to the investing public and to Aviation Sales shareholders during the Class Period omitted or misrepresented material facts about the financial condition, business and income of Aviation Sales;

c. With respect to the Exchange Act claims, whether the defendants acted with knowledge or severe reckless disregard of the truth in omitting to state and/or misrepresenting material facts;

     d.   Whether the market price of Aviation Sales' stock was artificially inflated during the Class Period due to the non-disclosures and/or material misrepresentations complained of herein;

     e.   Whether the defendants participated in and pursued the common course of conduct complained of herein; and

     f.   Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

136. For the Exchange Act claims, plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-market doctrine.  The market for Aviation Sales stock was at all times an efficient market for the following reasons, among others:

     a.   Aviation Sales met the requirements for listing, and was listed on the NYSE;

     b.   As a regulated issuer, Aviation Sales filed periodic public reports with the SEC and the NYSE;

     c.   The volume of trading in Aviation Sales' stock was substantial during the Class Period;

     d.   Aviation Sales was followed by various securities analysts who wrote reports which were available through various automated data retrieval services;

     e.   Aviation Sales disseminated information on a market-wide basis through various electronic media services, including issuing press releases through the <u>Business Wire</u> news service; and

     f.   The market price of Aviation Sales stock reacted efficiently to new information entering the market.

137. The foregoing facts indicate the existence of an efficient market for trading of Aviation Sales' stock and make applicable the fraud-on-the-market doctrine. Similarly, plaintiffs and the other members of the Class are entitled to a presumption of reliance with respect to the misstatements and omissions alleged herein.

### NO STATUTORY SAFE HARBOR

138. The federal statutory "safe harbor" provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false, forward-looking statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying the important factors that caused the actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement pleaded, the defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made and so identified, the speaker knew the forward-looking statement was materially false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aviation Sales, who knew that those statements were false when made.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of himself and the other members of the class, pray for judgment against the defendants as follows:

A.   Declaring this action to be properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and declaring plaintiffs to be a proper class representative;

B.   Declaring and determining that the defendants violated the federal securities laws by reason of their conduct as alleged herein;

C.   Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs and the other members of the class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein and post-judgment interest and costs;

D.   Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

E.   Awarding plaintiffs and the other members of the class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:   March 13, 2000

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**

By:   _Kenneth J. Vianale_
       Kenneth J. Vianale
       (Fla. Bar No. 169668)
       Maya Saxena
       (Fla. Bar No. 095494)

5355 Town Center Road
Suite 900
Boca Raton, FL 33486
Tel:   (561) 361-5000
Fax:   (561) 367-8400

**KAPLAN, KILSHEIMER & FOX LLP**

By:   _Robert N. Kaplan_ w/permission by KJV
       Robert N. Kaplan
       (Admitted *pro hac vice*)
       Laurence D. King
       Christina M. Comas

805 Third Avenue, 22nd Floor
New York, NY  10022
Tel:   (212) 687-1980
Fax:   (212) 687-7714

**CHERRY & LEHMAN**

By:   _Myron M. Cherry_ w/permission by KJV
       Myron M. Cherry
       (Admitted *pro hac vice*)
       Matthew D. Tanner

30 N. LaSalle Street
Chicago, IL 60602
Tel:   (312) 372-2100
Fax:   (312) 853-0279

**Plaintiffs' Co-Lead Counsel**

**COHEN, MILSTEIN, HAUSFELD**
 **& TOLL, PLLC**
Andrew N. Friedman
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
Tel:  (202) 408-4600
Fax:  (202) 408-4699

**BURT & PUCILLO LLP**
Michael J. Pucillo
515 North Flagler Drive
Suite 1701
West Palm Beach, FL 33401
Tel: (561) 835-9400
Fax: (561) 835-0322

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Fred Taylor Isquith
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 545-4653

**FINKELSTEIN & KRINSK**
Jeffrey R. Krinsk
The Koll Center
501 West Broadway, Suite 1250
San Diego, CA  92101-3579
Tel:  (619) 238-1333
Fax:  (619) 238-5425

**SHEPHERD & GELLER, LLC**
Paul J. Geller
7200 West Camino Real, Suite 203
Boca Raton, FL  33433
Tel:  (561) 750-3000
Fax:  (561) 750-3364

**CHITWOOD & HARLEY**
Neal S. Berinhout
2900 Promenade II
1230 Peachtree Street, NE
Atlanta, GA  30309
Tel:  (404) 873-3900
Fax:  (404) 876-4476

**LAW OFFICES OF**
 **CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center
Suite 2525
401 East Pratt Street
Baltimore, MD  21202
Tel:  (410) 332-0030
Fax:  (410) 685-1300

**KIRBY MCINERNEY & SQUIRE, LLP**
Ira M. Press
830 Third Avenue
New York, NY 10022
Tel: (212) 317-2300
Fax: (212) 751-2540

**SPECTOR & ROSEMAN**
Robert M. Roseman
1818 Market Street
Suite 2500
Philadelphia, PA  19103
Tel:  (215) 496-0300
Fax:  (215) 496-6611

**Counsel for Plaintiff**

# APPENDIX A

## Lead Plaintiffs' Purchases

| NAME | DATE | SHARES PURCHASED | SHARE PRICE |
|---|---|---|---|
| Holmes as General Partner of Gilford Partners | 07/27/99 | 20,000 | $39.50 |
| Holmes as General Partner of Gilford Partners | 07/29/99 | 5,000 | $29.00 |
| Holmes as General Partner of Gilford Partners | 08/28/99 | 2,500 | $31.91 |
| Holmes as General Partner of Gilford Partners | 08/31/99 | 5.000 | $30.69 |
| Holmes as General Partner of Gilford Partners | 09/01/99 | 7,500 | $30.56 |
| Holmes as General Partner of Gilford Partners | 09/01/99 | 1,000 | $30.38 |
| Holmes as General Partner of Gilford Partners | 09/10/99 | 5,000 | $33.26 |
| Holmes Family Trust | 07/22/99 | 5,000 | $40.80 |
| Holmes Family Trust | 07/27/99 | 5,000 | $39.25 |
| Holmes Family Trust | 08/24/99 | 5,000 | $33.86 |
| Holmes Family Trust | 09/01/99 | 5,000 | $30.61 |
| Holmes, Debra as trustee for Kelly Homes | 07/23/99 | 5,000 | $39.68 |
| Holmes, Debra as trustee for Kelly Homes | 07/29/99 | 2,500 | $38.88 |
| Holmes, Debra as trustee for Kelly Homes | 08/05/99 | 2,500 | $28.00 |
| Holmes, Debra as trustee for Kelly Homes | 08/31/99 | 5,000 | $30.50 |
| Holmes, Debra as trustee for William Holmes | 07/23/99 | 5,000 | $39.68 |
| Holmes, Debra as trustee for William Holmes | 07/29/99 | 2,500 | $38.88 |
| Holmes, Debra as trustee for William Holmes | 08/05/99 | 2,500 | $28.00 |
| Holmes, Debra as trustee for William Holmes | 08/31/99 | 5,000 | $30.50 |
| Holmes, Debra | 07/23/99 | 5,000 | $40.80 |
| Holmes, Debra | 07/28/99 | 5,000 | $38.88 |
| Holmes, Debra | 08/25/99 | 5,000 | $33.86 |

| | | | |
|---|---|---|---|
| Holmes, Debra | 09/03/99 | 5,000 | $30.81 |
| Holmes, Robert . IRA | 07/26/99 | 10,000 | $40.00 |
| Holmes, Robert . IRA | 08/02/99 | 5,000 | $38.74 |
| Holmes, Robert . IRA | 08/12/99 | 5,000 | $38.75 |

# APPENDIX B

## Plaintiffs' Purchases

| NAME | DATE | SHARES PURCHASED | SHARE PRICE |
|---|---|---|---|
| Allison, James | 08/17/99 | 1000 | $37.75 |
| Allison, James | 08/20/99 | 500 | $36.69 |
| Allison, James | 08/25/99 | 500 | $34.87 |
| Allison, James | 09/02/99 | 500 | $32.50 |
| Bayer, Bruce | 09/03/99 | 600 | $34.31 |
| Bayer, Bruce | 09/08/99 | 2000 | $33.63 |
| Bettge, David | 06/16/99 | 150 | $36.69 |
| Chahal, Rajiner | 09/16/99 | 800 | $29.38 |
| Chahal, Rajiner | 09/10/99 | 300 | $33.00 |
| Chahal, Rajiner | 09/10/99 | 200 | $33.06 |
| Chahal, Rajiner | 08/27/99 | 450 | $33.63 |
| Ellin, Doug | 09/16/99 | 600 | $30.38 |
| Flannery, Kevin S. | 08/10/99 | 1,000 | $39.13 |
| Flannery, Kevin S. | 09/03/99 | 3,000 | $33.46 |
| Flannery, Kevin S. | 08/24/99 | 1,000 | $37.63 |
| Flannery, Kevin S. | 08/09/99 | 5,000 | $39.00 |
| Flannery, Kevin S. | 08/10/99 | 5,000 | $39.25 |
| Flannery, Kevin S. | 08/11/99 | 1,800 | $37.37 |
| Flannery, Kevin S. | 08/11/99 | 3,200 | $37.37 |
| Flannery, Kevin S. | 08/24/99 | 6,800 | $36.33 |
| Fowler, John E. | 09/02/99 | 100 | $30.31 |
| Garozzo, Benito | 07/27/99 | 500 | $40.75 |
| Garozzo, Benito | 07/27/99 | 500 | $40.00 |
| Garozzo, Benito | 08/26/99 | 500 | $31.50 |
| Garozzo, Benito | 08/26/99 | 700 | $31.69 |
| Garozzo, Benito | 08/31/99 | 300 | $30.69 |
| Gladden, Bob | 09/07/99 | 20 | $33.63 |
| Hodgins, Daniel | 08/18/99 | 100 | $37.50 |
| Holmes as General Partner of Gilford Partners | 07/27/99 | 20,000 | $39.50 |
| Holmes as General Partner of Gilford Partners | 07/29/99 | 5,000 | $29.00 |
| Holmes as General Partner of Gilford Partners | 08/28/99 | 2.500 | $31.91 |
| Holmes as General Partner of Gilford Partners | 08/31/99 | 5.000 | $30.69 |

| | | | |
|---|---|---|---|
| Holmes as General Partner of Gilford Partners | 09/01/99 | 7,500 | $30.56 |
| Holmes as General Partner of Gilford Partners | 09/01/99 | 1,000 | $30.38 |
| Holmes as General Partner of Gilford Partners | 09/10/99 | 5,000 | $33.26 |
| Holmes Family Trust | 07/22/99 | 5,000 | $40.80 |
| Holmes Family Trust | 07/27/99 | 5,000 | $39.25 |
| Holmes Family Trust | 08/24/99 | 5,000 | $33.86 |
| Holmes Family Trust | 09/01/99 | 5,000 | $30.61 |
| Holmes, Debra as trustee for Kelly Homes | 07/23/99 | 5,000 | $39.68 |
| Holmes, Debra as trustee for Kelly Homes | 07/29/99 | 2,500 | $38.88 |
| Holmes, Debra as trustee for Kelly Homes | 08/05/99 | 2,500 | $28.00 |
| Holmes, Debra as trustee for Kelly Homes | 08/31/99 | 5,000 | $30.50 |
| Holmes, Debra as trustee for William Holmes | 07/23/99 | 5,000 | $39.68 |
| Holmes, Debra as trustee for William Holmes | 07/29/99 | 2,500 | $38.88 |
| Holmes, Debra as trustee for William Holmes | 08/05/99 | 2,500 | $28.00 |
| Holmes, Debra as trustee for William Holmes | 08/31/99 | 5,000 | $30.50 |
| Holmes, Debra | 07/23/99 | 5,000 | $40.80 |
| Holmes, Debra | 07/28/99 | 5,000 | $38.88 |
| Holmes, Debra | 08/25/99 | 5,000 | $33.86 |
| Holmes, Debra | 09/03/99 | 5,000 | $30.81 |
| Holmes, Robert . IRA | 07/26/99 | 10,000 | $40.00 |
| Holmes, Robert . IRA | 08/02/99 | 5,000 | $38.74 |
| Holmes, Robert . IRA | 08/12/99 | 5,000 | $38.75 |
| Karambelas, Nicholas G. | 07/30/99 | 50 | $39.00 |
| Karambelas, Nicholas G. | 06/16/99 | 50 | $36.69 |
| Kelly, Ken | 07/30/99 | 128 | $38.88 |
| Kramer, Robert | 06/11/99 | 200 | $37.63 |
| Krause, Don | 08/09/99 | 11 | $39.06 |
| Krause, Don | 08/11/99 | 60 | $38.00 |
| Loew, Rosalie | 09/13/99 | 250 | $34.19 |
| Medlin, Thomas | 08/26/99 | 200 | $33.50 |
| Medlin, Thomas | 09/17/99 | 100 | $23.75 |
| Mica, George | 06/25/99 | 50 | $37.13 |
| Mueller. Lee A. | 06/15/99 | 100 | $39.36 |
| Rae Anderson, Marjorie | 09/20/99 | 300 | $18.38 |

| | | | |
|---|---|---|---|
| Rae Anderson, Marjorie | 09/17/99 | 200 | $22.00 |
| Rae Anderson, Marjorie | 09/16/99 | 200 | $29.69 |
| Rae Anderson, Marjorie | 08/24/99 | 100 | $34.00 |
| Rae Anderson, Marjorie | 08/05/99 | 100 | $38.44 |
| Rae Anderson, Marjorie | 07/29/99 | 100 | $39.75 |
| Ramsey, Ralph | 08/02/99 | 100 | $39.43 |
| Reich, Gerald | 08/11/99 | 20,000 | $37.31 |
| Reich, Gerald A/C Robert Reich | 08/03/99 | 15,200 | $38.75 |
| Riggs, Sheila T. | 08/18/99 | 100 | $39.63 |
| Siegel, Jay | 09/14/99 | 500 | $32.63 |
| Smith, Alan | 09/03/99 | 300 | $34.75 |
| Teitelbaum, Sam | 07/27/99 | 500 | $40.06 |
| Verska, Daniel | 09/09/99 | 3,000 | $34.69 |
| Verska, Daniel | 09/16/99 | 3,000 | $29.19 |
| Verska, Daniel | 09/17/99 | 4,000 | $22.06 |
| Washburn, Robert and Suzanne Rev. Trust | 09/09/99 | 4,800 | $34.99 |
| Washburn, Robert and Suzanne Rev. Trust | 08/25/99 | 5,000 | $33.69 |
| Washburn, Robert and Suzanne Rev. Trust | 07/26/99 | 5,000 | $39.50 |
| Washburn, Robert Roth IRA | 09/09/99 | 5,000 | $34.99 |
| Washburn, Robert Roth IRA | 08/11/99 | 5,000 | $37.31 |
| Washburn, Robert Roth IRA | 08/06/99 | 5,000 | $38.00 |
| Washington, Wade | 08/31/99 | 300 | $30.75 |
| Yeager, Ronald | 08/17/99 | 200 | $37.44 |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 13, 2000, a true and correct copy of the enclosed Amended Class Action Complaint was served by First Class Mail to the following:

Stanley H. Wakshlag, Esq.
Brian P. Miller, Esq.
Akerman, Senterfitt
 & Eidson, P.A.
One S.E. 3rd Avenue
28th Floor
Miami, FL  33131

Attorneys for Defendants

Kenneth J. Vianale